Filed 5/16/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LARA HERZOG et al., | D082847 |
| Petitioners, | |
| v. | (San Diego County Super. Ct. Nos. |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | 37-2022-00049800-CU-PL-CTL, 37-2023-00012889-CU-PL-CTL, 37-2023-00014497-CU-PL-CTL, |
| Respondent; | 37-2023-00014471-CU-PL-CTL, 37-2022-00047846-CU-PL-CTL) |
| DEXCOM, INC., | |
| Real Party in Interest. | |
| *[And four other cases.] | |

ORIGINAL PROCEEDING on five consolidated petitions for writ of mandate. Relief granted.

---

*       *Moore v. Superior Court* (No. D082867); *Tsakiris v. Superior Court* (No. D082868); *Campbell Pierre v. Superior Court* (No. D082869); *Bottiglier v. Superior Court* (No. D082978).

Tosi Law, Timothy M. Clark and Min J. Koo (*pro hac vice*) for all Petitioners.

No appearance for Respondent.

Gordon Reese Scully Mansukhani, Kevin W. Alexander, Renata Ortiz Bloom; UB Greensfelder and Joshua A. Klarfeld (*pro hac vice*) for Real Party in Interest.

INTRODUCTION

Henry J. Hebert, Traci Moore, Aliya Campbell Pierre, Tiffanie Tsakiris, and Brenda Bottiglier are diabetic patients whose doctors prescribed the Dexcom G6 Continuous Glucose Monitoring System (Dexcom G6) to manage their diabetes. The Dexcom G6 allegedly malfunctioned and failed to alert each of them that their blood glucose level was either too low or too high, resulting in serious diabetic injuries; and in Hebert's case, untimely death.

Five separate products liability actions were then filed against the manufacturer, Dexcom, Inc. (Dexcom). In response to all five actions, Dexcom moved to compel arbitration. It asserted that each injured party entered a "clickwrap" agreement to arbitrate all disputes when they installed a mobile medical application called the "G6 App" on their personal smart devices to read their glucose levels and clicked the box next to, "I agree to Terms of Use." Terms of Use was a hyperlink to a separate webpage with contractual terms, including an arbitration provision. Agreeing with Dexcom, the trial court granted Dexcom's motions in all five cases.

Plaintiffs—Moore, Pierre, Tsakiris, Bottiglier, and Hebert's daughters, Lara Herzog and Melanie Samora—each petitioned this court for writ of mandate directing the trial court to vacate its orders compelling them to arbitrate. We consolidated the cases and issued an order directing Dexcom to show cause why the relief sought should not be granted. We now grant the

2

petitions and direct the trial court to vacate its orders granting Dexcom's motions to compel arbitration and to enter new orders denying the motions.

On our de novo review, we conclude the trial court erred. Although a clickwrap agreement—one in which an internet user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available—is generally enforceable, Dexcom's G6 App clickwrap agreement is not. We find that Dexcom undid whatever notice it might have provided of the contractual terms by explicitly telling the user that clicking the box constituted authorization for Dexcom to collect and store the user's sensitive, personal health information. For this reason, Dexcom cannot meet its burden of demonstrating that the same click constituted unambiguous acceptance of the Terms of Use, including the arbitration provision. Consequently, arbitration agreements were not formed with any of the plaintiffs.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Plaintiffs' Lawsuits*

Plaintiffs alleged Dexcom marketed and sold the Dexcom G6 "as a potentially life-saving medical device capable of detecting and preventing hyperglycemic and hypoglycemic events by alerting users of near-dangerous blood glucose levels that may trigger such events." The prescription medical device replaces fingerstick blood glucose testing and scanning to manage diabetes.

It consists of a wearable subcutaneous sensor patch that continuously measures and monitors glucose levels in real time; a transmitter that wirelessly sends glucose information to the user's display device; and the display device itself. It is designed to "literally 'sound the alarm' when a

3

near-dangerous glucose level is detected" so the diabetic patient is provided "at least a 20-minute advance warning and window to avoid a potential hyperglycemic or hypoglycemic event."

Hebert, Moore, Pierre, Tsakiris and Bottiglier each purchased and used the Dexcom G6 as prescribed by their medical provider. But for each, the Dexcom G6 allegedly malfunctioned: it failed to alert them of dangerous glucose levels or stopped transmitting glucose readings, depriving them of the " 'golden window' of time to intervene and prevent a potentially life-threatening medical condition." As a result, Moore, Pierre, Tsakiris and Bottiglier allegedly suffered serious diabetic injuries, some requiring hospitalization. In Hebert's case, the Dexcom G6's malfunction allegedly caused his untimely death.

Moore, Pierre, Tsakiris and Bottiglier sued Dexcom to recover damages for their injuries, asserting various causes of actions for products liability (the *Moore*, *Pierre*, *Tsakiris*, and *Bottiglier* cases). In addition to a survival cause of action on behalf of their father's estate, Herzog and Samora, Hebert's daughters, also asserted a wrongful death cause of action against Dexcom in their individual capacity (the *Herzog* case).

II.

*Dexcom's Motions to Compel Arbitration*

In all five cases, Dexcom responded to the operative complaint by moving to compel arbitration and to stay the action pending completion of arbitration. Dexcom's motions were virtually identical in each case. Their essential premise was that Hebert, Moore, Pierre, Tsakiris, and Bottiglier had used the G6 App and had entered an arbitration agreement with Dexcom during the process required to install the G6 App.

4

As its sole evidence of the purported arbitration agreements, Dexcom submitted a declaration from its senior manager of data privacy, Eric Lovell. Lovell's declaration was also identical in every case, with one exception we later discuss.

Consistent with the plaintiffs' complaints, Lovell explained the Dexcom G6 consisted of three components: a sensor, a transmitter, and a display device. According to a graphic in the Dexcom G6 "User Guide" (included in plaintiffs' complaints), the components look like this:

| What you see | What it's called | What it does |
|---|---|---|
| Applicator / Sensor (inside) | Applicator with built-in sensor | Applicator helps you insert the sensor wire under your skin. Sensor gets your glucose information. |
| | Transmitter | Transmitter sends your glucose information from the sensor to the display device. |
| | Display Device(s): • Receiver • Your smart device | Display device(s) shows your glucose information. Receiver is required for Medicare. |

A diabetic person could use the Dexcom receiver as her display device, without installing the G6 App. Or she could elect to use the G6 App to view her glucose data on "a compatible personal mobile device, such as an iPhone."

Lovell explained the process that is required to use the G6 App on a personal mobile device. "Upon initial launch of the G6 App, the G6 App displays a series of startup screens, known as the startup wizard" (which he sometimes called the "setup wizard"), "to have the user configure the device." The user is required to log in to a Dexcom account to use the G6 App, and if the user does not already have a Dexcom account, the G6 App will require new users to create a Dexcom account. "The setup wizard will then display a set of legal agreements from the web in a webview. The webview

5

communicates to the G6 App when the user hits 'Submit.'" According to Lovell, "The user cannot complete the setup process and use the G6 App without completing all of the aforementioned steps, including the acceptance of Dexcom's Terms of Use."

Attached as Exhibit D to Lovell's declaration was a "screenshot depicting the setup wizard steps" he just explained. It looked like this:



In the initial screen on the left, under the words "Your Dexcom Account," a user is prompted to enter a "Username" and "Password," and to click on a "Login" button. As we previously mentioned, Lovell explained a user would need to create a Dexcom account if one did not exist, in order to proceed past this initial screen. He did not explain, nor does Exhibit D show, how a user would create a Dexcom account, or whether that action would occur on the same screen or a different screen.

Once the user has successfully logged into an existing Dexcom account, or successfully created a new Dexcom account, the user would then advance

6

to the screen on the right of Exhibit D.  On this screen, titled "Legal," the following paragraph of text is displayed:[1]

> "You understand and agree that your use of this website or any DexCom Inc. mobile application or software platform for your DexCom continuous glucose monitor is subject to the Terms of Use, Privacy Policy and any other acknowledgements listed below.  *By ticking the boxes below you understand that your personal information, including your sensitive health information, will be collected, used and shared consistently with the Privacy Policy and Terms of Use.*  You further understand that personal information and sensitive personal information will be stored and processed by DexCom, Inc., and/or its affiliate, SweetSpot Diabetes Care, Inc. in the United States, which may have different data protection laws than the country in which you reside."  (Italics added.)

Underneath this paragraph were two boxes:  one next to the statement, "I agree to Terms of Use" and another next to, "I agree to Privacy Policy."  The phrases "Terms of Use" and "Privacy Policy," which were written in green, were hyperlinks that, if clicked, would take the user to separate webpages.  The user has to click on the boxes in order to place a check mark in them, which would then allow the user to click on the green "Submit" button that appeared below the boxes.  The user, however, is not required to actually view the hyperlinked Terms of Use (or the Privacy Policy) in order to complete the setup wizard process to use the G6 App.

The Terms of Use hyperlink, if clicked, would take the user to another webpage, titled "DEXCOM TERMS OF USE."  That webpage would display 22 pages of terms (if printed on standard 8.5 inch by 11 inch paper), including an arbitration provision.  Three versions of the Terms of Use were attached

---

[1]     This is presumably the "set of legal agreements" that is displayed "from the web in a webview" during the setup wizard process Lovell explained.

as exhibits to Lovell's declaration.  The first version was effective from September 18, 2018 through February 10, 2019 (Exhibit A); the second was effective from February 11, 2019 through February 24, 2021 (Exhibit B); and the third, which was the current version, had gone into effect February 25, 2021 (Exhibit C).  Dexcom presented all three versions in hard copy as paper documents, not as screenshots of how they would appear on a personal mobile device.  All three versions had an identical arbitration provision,[2] as well as a California choice of law provision.

On the first page of Exhibit A, underneath the title "**DEXCOM TERMS OF USE**," was a lengthy recital that, among other things, defined "[t]hese Terms of Use" as "this 'Agreement.'"  Near the bottom of the first page was the following statement:  "**By using (including accessing) any DexCom Product, DexCom Service or Soft-ware App or by clicking**

---

[2]    The arbitration provision stated, in relevant part, "EXCEPT FOR DISPUTES THAT QUALIFY FOR SMALL CLAIMS COURT, ALL DISPUTES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY ASPECT OF THE RELATIONSHIP BETWEEN YOU AND DEXCOM, WHETHER BASED IN CONTRACT, TORT, STATUTE, FRAUD, MISREPRESENTATION OR ANY OTHER LEGAL THEORY (EACH, A 'DISPUTE'), WILL BE RESOLVED THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY, AND YOU AGREE THAT DEXCOM AND YOU ARE EACH WAIVING THE RIGHT TO TRIAL BY A JURY. . . .  THE ARBITRATION WILL BE ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ('AAA'). . . .  THE ARBITRATOR WILL CONDUCT HEARINGS, IF ANY, BY TELECONFERENCE OR VIDEOCONFERENCE, RATHER THAN BY PERSONAL APPEARANCES, UNLESS THE ARBITRATOR DETERMINES UPON REQUEST BY YOU OR BY US THAT AN IN-PERSON HEARING IS APPROPRIATE. . . .  THE ARBITRATOR'S DECISION WILL FOLLOW THE TERMS OF THIS AGREEMENT AND WILL BE FINAL AND BINDING."

**'accept' to this Agreement, you are agreeing to this Agreement.**" Underneath this statement, at the bottom of the page, was an advisal stating, "PLEASE NOTE THAT THIS AGREEMENT CONTAINS A MANDATORY ARBITRATION OF DISPUTES PROVISION . . . ."[3] The arbitration provision itself appeared on the ninth and tenth pages of the document. Dexcom did not present evidence of how far into the webpage a person viewing the Terms of Use on a personal mobile device would have to scroll in order to encounter the advisal or the arbitration provision.

The Terms of Use also purported to place significant limitations on the liability of only Dexcom, its officers, directors, employees, agents, and suppliers, including terms purporting to exempt them from "any consequential, . . . special, punitive or exemplary damages," or from liability for "total damages for all claims arising from or relating to . . . Dexcom products, Dexcom services, and/or software apps in an aggregate amount greater than $500," "except to the extent that such limitation is prohibited under applicable law." (Capitalization omitted.)

For our purposes, Exhibits B and C were identical to Exhibit A, except for the following difference. In Exhibit B, the advisal that the agreement contained "A MANDATORY ARBITRATION OF DISPUTES PROVISION" appeared lower in the document; it started at the bottom of the first page and carried over into the top of the second page. In Exhibit C, the advisal was

---

3    The advisal stated in full:  "PLEASE NOTE THAT THIS AGREEMENT CONTAINS A MANDATORY ARBITRATION OF DISPUTES PROVISION THAT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS, TO THE EXTENT PERMITTED BY APPLICABLE LAW."

even further down and appeared entirely at the top of the document's second page.

Lovell averred that a user "cannot complete the setup process and use the G6 App without completing all of the aforementioned steps" on the account login screen and the "Legal" screen, "including the acceptance of Dexcom's Terms of Use."

This, of course, begged the question whether Hebert, Moore, Pierre, Tsakiris, or Bottiglier had used the G6 App to view their glucose levels on a personal mobile device rather than the Dexcom receiver. It was on this point that Lovell's declaration varied. Lovell averred that Dexcom maintained "certain data" for users who elect "to download the G6 App to their compatible personal mobile device and complete the required G6 App setup process," which "can include data regarding [the] date on which a user completed the G6 App setup wizard and accepted Dexcom's Terms of Use."

In the *Moore*, *Tsakiris*, and *Bottiglier* cases, Lovell identified the date when a user with a Dexcom account registered to the name of the plaintiff "completed the G6 App setup wizard and accepted Dexcom's Terms of Use." For Moore, this date was May 19, 2020; for Tsakiris, it was March 17, 2017 and July 23, 2022; and for Bottiglier, it was December 17, 2019. In its motions to compel arbitration, Dexcom argued that Moore, Tsakiris, and Bottiglier had agreed to Dexcom's Terms of Use, including the arbitration provision, on these dates.

In *Herzog* and *Pierre*, Lovell did not identify a date when a user with a Dexcom account registered to the name of Hebert or Pierre "completed the G6 App setup wizard and accepted Dexcom's Terms of Use." Instead, he simply averred, "Given the way Dexcom's G6 App setup operates, it is not possible for . . . Hebert [or Pierre] to have used the Dexcom G6 App without having

10

accepted Dexcom's Terms of Use." Dexcom asserted the *Herzog* plaintiffs and Pierre admitted in their complaints that Hebert and Pierre had used the G6 App.[4] It then argued Hebert and Pierre could not have used the G6 App without completing the setup wizard process and agreeing to its Terms of Use, including the arbitration provision.

The motions to compel arbitration in *Herzog*, *Moore*, *Pierre*, and *Tsakiris* came on for hearing separately from *Bottiglier*. But in all five cases, the trial court granted Dexcom's motions and ordered the plaintiffs to arbitrate their claims, with the exception of the *Herzog* plaintiffs' wrongful death claim, which it stayed. Plaintiffs then filed separate petitions for writ of mandate challenging the trial court's orders compelling arbitration. We consolidated the cases and issued an order to show cause.[5]

---

[4] As we explain later, we have independently considered the allegations of the *Herzog* complaint relied on by Dexcom and we disagree there were any admissions that Hebert used the G6 App. (See Discussion, Section IV, *post*.) For reasons we explain in footnote 11, *post*, we have no occasion to consider the sufficiency of the allegations of Pierre's complaint to establish G6 App use.

[5] Although our issuance of the order to show cause reflected our determination that plaintiffs satisfied the prerequisites for writ review (*Marron v. Superior Court* (*Hassanein*) (2003) 108 Cal.App.4th 1049, 1056), Dexcom argues in its return that plaintiffs failed to establish writ review is appropriate. We thus briefly explain our reasoning.

Writ review of orders compelling arbitration may be obtained, although "only in 'unusual circumstances' or in 'exceptional situations.'" (*Zembsch v. Superior Court* (2006) 146 Cal.App.4th 153, 160.) Unusual circumstances justifying writ review of orders compelling arbitration have been held to exist "if the matters ordered arbitrated fall clearly outside the scope of the arbitration agreement, or if the arbitration would appear to be unduly time consuming or expensive." (*Atlas Plastering, Inc. v. Superior Court* (1977) 72 Cal.App.3d 63, 68.) Such circumstances exist here. As we shall explain, we

11

DISCUSSION

I.

*Principles of Law*

A.    *Contract Formation Over the Internet*

" 'Under both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate.' " (*Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 460–461 (*Sellers*).)  We apply California law to determine the answer to this threshold question here.  (See *id.* at p. 462, fn. 4 ["courts generally apply state law principles governing the formation of contracts when deciding whether an agreement to arbitrate exists in the first instance"].)

Under basic principles of California contract law, "[m]utual assent, or consent, of the parties 'is essential to the existence of a contract' (Civ. Code, § 1550; see also Civ. Code, § 1565), and '[c]onsent is not mutual, unless the parties all agree upon the same thing in the same sense' (Civ. Code, § 1580)." (*Sellers*, *supra*, 73 Cal.App.5th at p. 460.)  "Mutual assent is determined

---

conclude that Dexcom failed to establish the formation of enforceable arbitration agreements.  Thus, withholding review until judgments are entered in each of the plaintiffs' cases would require the parties to devote significant time and resources to unnecessary arbitration proceedings. Plaintiffs' counsel has filed a total of 42 cases against Dexcom in which Dexcom either has moved or is expected to move to compel arbitration. Immediate review thus stands to provide guidance to the trial court, as well as other courts tasked with deciding Dexcom's motions.  Under these circumstances, writ review is proper.  (See e.g. *Zembsch,* at p. 161 [writ review appropriate where meritorious challenges to existence and enforceability of arbitration agreement were raised]; *Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758, 767–768 [granting writ review of order compelling arbitration where trial court's rationale raised a legal issue with "pressing . . . relevance to other pending consumer class actions"].)

under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings. The parties' outward manifestations must show that the parties all agreed 'upon the same thing in the same sense. If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." (*Ibid.* [cleaned up].) Further, "California law is clear—an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he [or she] was unaware, contained in a document whose contractual nature is not obvious." (*Id.* at p. 461 [cleaned up]; accord *Doe v. Massage Envy Franchising, LLC* (2022) 87 Cal.App.5th 23, 30–31 (*Massage Envy*).)

This "principle of knowing consent applies with particular force to provisions for arbitration, including arbitration provisions contained in contracts purportedly formed over the internet." (*Sellers, supra,* 73 Cal.App.5th at p. 460 [cleaned up].) In the context of an internet transaction, "in the absence of actual notice, a manifestation of assent may be inferred from the consumer's actions on the website—including, for example, checking boxes and clicking buttons—but any such action must indicate the parties' assent to the *same thing*, which occurs only when the website puts the consumer on constructive notice of the contractual terms. Thus, in order to establish mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting *to those very terms* when checking a box or clicking on a button." (*Id.* at p. 461, second italics added [cleaned up].) And "the full context of any transaction is critical to determining whether any particular notice is sufficient to put a

13

consumer on inquiry notice of contractual terms contained on a separate, hyperlinked page." (*Id.* at p. 453.)

B. *Standard of Review*

There is no uniform standard of review for evaluating a trial court's order granting or denying a motion to compel arbitration. (See *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 60 (*Avery*).) If the court's order is based on a decision of fact, we adopt a substantial evidence standard. (*Ibid.*) If the court's ruling rests solely on a decision of law or on undisputed facts, we apply a de novo standard of review. (*Ibid.*) And where the court's ruling is "based on the threshold issue of the existence of a contract, and the evidence of the alleged contract formation consists primarily of undisputed screenshots of the website at issue, our review is de novo." (*Sellers, supra,* 73 Cal.App.5th at p. 462; accord *B.D. v. Blizzard Entertainment, Inc.* (2022) 76 Cal.App.5th 931, 949 (*Blizzard*).)

Dexcom, as the party seeking arbitration, bears the burden of proving the existence of an arbitration agreement. (See *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236; *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413 ["Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence."].) Here, Dexcom relied solely on the undisputed screenshots of the G6 App setup process, and Lovell's declaration explaining that process, to establish the formation of binding arbitration agreements.[6] Our review of the trial court's resolution of the contract

---

[6] In *Herzog*, *Moore*, *Pierre*, and *Tsakiris*, the plaintiffs did not submit evidence in opposition to Dexcom's motions to compel arbitration. In *Bottiglier*, the plaintiff did file an opposing declaration, but it addressed

14

formation question is therefore independent.[7] (*Sellers*, *supra*, 73 Cal.App.5th at p. 462 ["where there is no dispute as to the material facts, 'the existence of a contract is a question [of law] for the court to decide' "]; accord *Pinnacle*, at p. 236 [where "the evidence is not in conflict" the trial court's arbitration ruling is reviewed de novo].)

## II.

### *Dexcom Failed To Establish the Formation of an Agreement To Arbitrate*

Plaintiffs dispute there is a voluntary or mutual agreement to arbitrate, including because the arbitration provision was insufficiently conspicuous and fell outside their reasonable expectations as patients prescribed the Dexcom G6. Dexcom responds that plaintiffs entered valid arbitration agreements when they launched the G6 App, "clicked the acknowledgement and assented to the [Terms of Use] Agreement"—in other

---

topics that differed from those covered by Lovell's declaration. To the extent she averred she did not read the Terms of Use, we agree with Dexcom this is not a defense to contract formation. Because mutual assent is determined under an objective standard, "[i]f an offeree objectively manifests assent to an agreement, the offeree cannot avoid a specific provision of that agreement on the ground the offeree did not actually read it." (*Blizzard, supra*, 76 Cal.App.5th at p. 943.) We do not rely on Bottiglier's other averments, including her assertions that she launched the G6 App only after she had trouble with her Dexcom receiver and downloaded the G6 App after her medical provider suggested it as an alternative. We find it unnecessary to consider these facts because we conclude Dexcom's moving evidence fell short of establishing agreements to arbitrate.

[7] To the extent Dexcom contends our review of the trial court's determination of the existence of arbitration agreements is governed by the substantial evidence standard of review, we disagree. As noted, the evidence was not conflicting, and the court was not required to resolve factual disputes in deciding that Dexcom succeeded in establishing the existence of agreements to arbitrate.

15

words, when they clicked the checkbox on the "Legal" screen next to the statement "I agree to Terms of Use." It argues this is a "classic 'clickwrap' agreement, valid and routinely enforced under California law." As we shall explain, we conclude Dexcom failed to establish that plaintiffs formed binding arbitration agreements when they clicked this checkbox.[8]

Because Dexcom did not present evidence that plaintiffs had actual notice of the Terms of Use, it was required to establish contract formation on a constructive or inquiry notice theory. (*Sellers*, *supra*, 73 Cal.App.5th at p. 453; see Civ. Code, § 19 [defining constructive notice].) To succeed on this theory, Dexcom needed to show that it provided prospective G6 App users with reasonably conspicuous notice of the existence of the terms to which they were to be bound. Importantly here, it was required to show that the content of its "Legal" screen supports the inference that the user's action on that screen—here, clicking the checkbox—constituted an unambiguous manifestation of assent to those terms, including the arbitration provision. (See *Sellers*, at p. 469 [" '[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility' "]; *Berman v. Freedom Financial Network, LLC* (9th Cir. 2022) 30 F.4th 849, 856 (*Berman*) ["an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous

---

8    Because the parties' briefs failed to fully address all relevant aspects of the G6 App launch transaction, in particular the content of the text on the "Legal" screen, we directed them to submit supplemental briefs on this topic. (Gov. Code, § 68081.) We have considered the arguments set forth in their supplemental briefs and discuss them to the extent relevant. Further, Dexcom has filed letters citing new authorities which we have also reviewed and considered.

notice of the terms to which the consumer will be bound; and (2) the consumer takes some action . . . that unambiguously manifests his or her assent to those terms"]; *Long v. Provide Commerce, Inc.* (2016) 245 Cal.App.4th 855, 863 (*Long*) [absent actual notice, validity of internet agreement turns on whether the provider's website puts reasonably prudent users on inquiry notice of the contractual terms].)

In arguing that its G6 App setup process resulted in the formation of binding arbitration agreements with prospective app users, Dexcom relies heavily on the position that its Terms of Use were presented in clickwrap format, and clickwrap agreements "are regularly enforced." We agree Dexcom's Terms of Use are properly categorized as a clickwrap, a form of internet agreement generally regarded as enforceable because it requires the user to manifest assent to a website's terms of use "by clicking an I agree or I accept button, with a link to the agreement readily available." (*Sellers*, *supra*, 73 Cal.App.5th at p. 463 [cleaned up].)

But categorizing the purported agreement as a clickwrap does not resolve the formation question before us. As this court has explained, "it is the degree of notice provided, not the label, that is determinative." (*Blizzard*, *supra*, 76 Cal.App.5th at p. 950; accord *Sellers*, *supra*, 73 Cal.App.5th at p. 466 ["the classification of web based contracts alone does not resolve the issue of legally sufficient notice inquiry" (cleaned up)].) And as a recent decision of the Second District Court of Appeal illustrates, the context of the transaction and the content of the screen on which a clickwrap is presented can undermine the inference the consumer had notice of the terms to which they were assenting when they clicked the associated checkbox. (*Massage Envy*, *supra*, 87 Cal.App.5th at pp. 31–34 [rejecting purported clickwrap agreement where the context of the transaction and the content of the screen

17

on which the clickwrap was presented made it appear the plaintiff was agreeing to a different set of terms pertaining to a different party]; see also *Sgouros v. TransUnion Corp.* (7th Cir. 2016) 817 F.3d 1029, 1034–1036 (*Sgouros*) [rejecting purported arbitration agreement where website text told customers clicking on the box "served a particular purpose unrelated to" the agreement].) That is the case here.

A.     *No Reasonably Conspicuous Notice of the Terms*

Prospective G6 App users who encountered the clickwrap on Dexcom's "Legal" screen were engaged in the launch of the G6 App. Use of the app was optional; it was not required in order to make the Dexcom G6 device function. It simply made it possible for the Dexcom G6 user to view their glucose data on a personal mobile device.

Upon arriving at the "Legal" screen of the setup process, users were met with the following three-sentence paragraph: "You understand and agree that your use of this website or any DexCom Inc. mobile application or software platform for your DexCom continuous glucose monitor is subject to the Terms of Use, Privacy Policy and any other acknowledgements listed below. *By ticking the boxes below you understand that your personal information, including your sensitive health information, will be collected, used and shared consistently with the Privacy Policy and Terms of Use. You further understand that personal information and sensitive personal information will be stored and processed by DexCom, Inc., and/or its affiliate, SweetSpot Diabetes Care, Inc. in the United States, which may have different data protection laws than the country in which you reside.*" (Italics added.) The clickwrap—the checkbox next to the hyperlinked Terms of Use webpage—was directly underneath this paragraph.

We cannot conclude that a reasonably prudent user in the position of the plaintiffs would understand after reading this text that the Terms of Use were intended to govern any matters other than the scope of the user's waiver of privacy rights and the management of the user's personal information. The first sentence on the screen did state the user was agreeing to the "Terms of Use . . . listed below."  However, because the phrase "Terms of Use" appeared in the second sentence on the screen as well as in the hyperlink at the bottom of the screen, both of which were "below" the first sentence, this was at best only an uncertain reference to the full scope of terms in the hyperlinked webpage.  Moreover, this sentence did not advise the user that use of the Dexcom G6 *device* would also be subject to the Terms of Use, nor would the user have any reason to suspect that it would, given that the process at hand involved the G6 App and the user had already completed the transactions necessary to acquire the Dexcom G6 device.

Further, the second and third sentences on the screen (italicized in the paragraph above) explicitly specified the understandings the user was manifesting by "ticking the box[ ]" next to "I agree to Terms of Use."  Because these sentences expressly defined what it meant to "agree to Terms of Use," they limited the scope of the agreement the user was entering by clicking the checkbox associated with the clickwrap at the bottom of the screen.  The second sentence told the user that by clicking the checkbox, they were communicating their understanding that their personal information would be collected, used and shared "consistently with" the Terms of Use.  The third sentence reinforced the message that the proposed agreement pertained only to privacy issues by telling users they "further" understood Dexcom and/or its affiliate would store and process their personal information in the United

States, "which may have different data protection laws than the country in which you reside."

A user would have no reason to believe, given the context of the transaction and the content of the text on the "Legal" screen, that by clicking the checkbox next to "I agree to Terms of Use" they were entering an agreement that concerned any matters other than the scope of the user's privacy waiver and management of the user's personal information. Because privacy rights and the collection, use, and sharing of personal information were the very matters implicated by the launch of the G6 App—an app that facilitated the transmission of the user's glucose data to a personal mobile device—the user would have no reason to suspect the agreement, as proposed on the screen, was unduly limited.[9]

"If the party who receives information of circumstances suggesting an inquiry for the principal fact, makes that inquiry with due diligence, the result must be either that he will ascertain the fact, or that he will be prevented from doing so by causes for which he is not to blame, and from which he ought not to suffer." (Code commrs. note, Deering's Ann. Civ. Code

---

[9] Dexcom contends plaintiffs, relying on *Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, seek to create a " 'medical device' exception" to the enforceability of arbitration clauses. *Wheeler* held that an arbitration provision contained in a hospital's admission form was unenforceable because it fell outside the reasonable expectations of a patient admitted to the hospital for the purpose of undergoing diagnostic studies. (*Wheeler*, at pp. 349–350.) Plaintiffs argue that, like the patient in *Wheeler*, their status as diabetic patients prescribed a life-saving medical device must be taken into account in assessing whether the arbitration provision was within their reasonable expectations. We find it unnecessary to address any of these contentions. We do not rely on *Wheeler* or plaintiffs' status as diabetic patients in ruling that Dexcom's clickwrap failed to create binding arbitration agreements.

(2005 ed.) foll. § 19, p. 35.)  Here, Dexcom told users the agreement they were entering pertained only to the collection, use, sharing, storing, and processing of their personal information, including sensitive personal information and sensitive health information.  By doing so, it limited the scope of users' inquiry notice to those subject matters.  A user unconcerned about others' possession of their personal information—as was likely to be the case, given the nature of the app—would have no reason to inquire further.  Such a person cannot be said to have risked the possibility that, by entering the agreement, they were also consenting to binding arbitration of personal injury claims arising from injuries caused by Dexcom's products.

As numerous courts have held, " 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.' " (*Long*, *supra*, 245 Cal.App.4th at p. 867, citing *Nguyen v. Barnes & Noble Inc.* (9th Cir. 2014) 763 F.3d 1171, 1179 (*Nguyen*); *Sellers*, *supra*, 73 Cal.App.5th at p. 476; *Weeks v. Interactive Life Forms, LLC* (2024) 100 Cal.App.5th 1077, 1086 (*Weeks*).)  Here, Dexcom elected to tell users that by "ticking the box[ ] below" they were conveying a finite set of understandings related to the management of their personal information.  It could have, but did not, tell users the same click would *also* commit the user to binding arbitration in the event they were injured by Dexcom's products.  By expressly tying the user's action to a limited set of consequences, it implicitly excluded the possibility that same action would have other consequences.  (See *Stephenson v. Drever* (1997) 16 Cal.4th 1167, 1175 ["The fact that the contract expressly so provides tends to negate any inference that the parties also intended another consequence to flow from the same event.  *Expressio unius est exclusio alterius.*"]; see *Nguyen*, at p. 1175 [while internet commerce " 'has exposed courts to many new situations, it has not fundamentally changed the

21

principles of contract' "].)  For these reasons, we cannot conclude that Dexcom provided users with information sufficient to put them on inquiry notice of the subject arbitration provision.  Nor can we conclude that the Terms of Use—including the arbitration provision—were presented to users " 'in a manner that made it apparent' " they were " 'assenting to those very terms when . . . clicking on a [checkbox]' " next to the statement, "I agree to Terms of Use."  (See *Massage Envy*, *supra*, 87 Cal.App.5th at p. 32; *Sellers*, *supra*, 73 Cal.App.5th at p. 461.)

The context in which Dexcom's clickwrap was presented mirrors certain contextual features that led the *Massage Envy* court to reject a purported clickwrap agreement.  There, the plaintiff had an existing membership with an independently owned massage franchise location.  (*Massage Envy*, *supra*, 87 Cal.App.5th at pp. 26–27.)  The franchisor claimed the plaintiff agreed to a hyperlinked "Terms of Use Agreement" containing an arbitration clause when she completed an electronic general consent form while checking in for a massage appointment.  (*Id*. at pp. 27–29.)  The general consent screen had a boldface heading, "Assumption of Risk, Release, Waiver of Liability, and Indemnification," followed by text that related to these topics.  The clickwrap with the hyperlink was at the bottom of the form, underneath this text.  (*Id*. at pp. 28–29.)

In concluding there was no agreement to arbitrate, the *Massage Envy* court observed that because the plaintiff had a preexisting contractual relationship with the independent massage location, she had no reason to believe the check-in process for her massage involved the franchisor. (*Massage Envy*, *supra*, 87 Cal.App.5th at p. 31.)  It also noted that the context in which the terms of use agreement was presented made it appear that it involved nothing other than the " 'assumption of risk, release, waiver of

22

liability, and indemnification.' " (*Id.* at p. 32.) The court reasoned, "[T]he entire check-in experience made it appear that by clicking that button and signing her name plaintiff was agreeing to the General Consent . . . . In these circumstances, she did not enter any agreement [to arbitrate] with [the franchisor]." (*Ibid.*)

Similarly, here, the G6 App launch was a transaction separate from the transactions the user had already completed in order to acquire the Dexcom G6. Users would have no reason to anticipate encountering during the app launch new contractual terms governing their use of the Dexcom G6, a device they had already acquired with their medical provider's prescription. Similar to *Massage Envy*, the context in which Dexcom's Terms of Use were presented made it appear they governed nothing other than privacy and management of the user's personal information. We reach the same conclusion as the court in *Massage Envy*: in these circumstances, the user did not enter any agreement to arbitrate.

The notice problem created by the text on Dexcom's "Legal" screen also closely resembles the problem confronted by the court in *Sgouros, supra*, 817 F.3d 1029. In *Sgouros*, the plaintiff purchased a credit score package using TransUnion's website. One of the webpages the plaintiff was required to proceed through in order to make his purchase contained a service agreement with an arbitration provision in an inset scroll box. The immediately visible text in the scroll box had the title "Service Agreement" and said that it " 'contains the terms and conditions upon which you . . . may access and use[.]' " (*Id.* at p. 1032.) At the bottom of the screen was a button that said, "I Accept & Continue to Step 3." (*Id.* at pp. 1032, 1033.) Underneath the scroll box and above the button was the following text: "You understand that by clicking on the 'I Accept & Continue to Step 3' button below, you are

23

providing 'written instructions' to TransUnion Interactive, Inc. authorizing TransUnion Interactive, Inc. to obtain information from your personal credit profile from Experian, Equifax and/or TransUnion. You authorize TransUnion Interactive, Inc. to obtain such information solely to confirm your identity and display your credit data to you." (*Ibid.*)

The Seventh Circuit, applying Illinois law—which, like California law, uses an objective approach to mutual assent—independently concluded the notice provided on TransUnion's webpage was insufficient, including because while the scroll box contained the visible words "Service Agreement," it "said nothing about what the agreement regulated." (*Sgouros*, *supra*, 817 F.3d at p. 1035.) But what was dispositive to the court was the language under the scroll box, which compelled the court to conclude: "TransUnion undid whatever notice it might have been furnishing . . . by explicitly stating that a click on the button constituted assent for TransUnion to obtain access to the purchaser's personal information. That text distracted the purchaser from the Service Agreement by informing him that *clicking served a particular purpose unrelated to the Agreement.*" (*Id.* at p. 1036, italics added.)

Similar circumstances are present here. Although Dexcom's screen had the title "Legal," and the first sentence on the screen drew the user's attention to the hyperlinked Terms of Use agreement, and the hyperlink was visible at the bottom of the screen, Dexcom "undid whatever notice it might have been furnishing" with these features "by explicitly stating" that ticking the box next to "I agree to Terms of Use" constituted the user's assent to have their *personal information* managed "consistently with" the terms of use. (See *Sgouros*, *supra*, 817 F.3d at p. 1036.) As in *Sgouros*, this text "distracted" the user by informing him or her that clicking the box "served a particular purpose" other than agreeing to be bound to the full scope of the

24

hyperlinked Terms of Use agreement, including an arbitration provision. (See *ibid.*)  Under these circumstances, no agreement to arbitrate was formed when the user clicked the checkbox next to "I agree to Terms of Use."

Dexcom contends the notice its "Legal" screen provided to users was sufficient because it "mirror[ed]" the notice provided in *Blizzard*.  But the opposite is true.  In *Blizzard*, the license agreement incorporating the arbitration provision was presented to users in a popup window that enabled the user to scroll through and read the entire agreement.  (*Blizzard*, *supra*, 76 Cal.App.5th at p. 940.)  The immediately visible portion of the agreement advised users to " '**CAREFULLY READ TH[E] AGREEMENT**' " and to " 'PLEASE NOTE THAT THE SECTION BELOW TITLED DISPUTE RESOLUTION CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER.  THEY AFFECT YOUR LEGAL RIGHTS. PLEASE READ THEM.' "  (*Id.* at pp. 951–952.)  Here, by contrast, Dexcom's "Legal" screen did not present the terms (that go on for 22 pages when printed on standard paper) to users in a scrollable popup window giving them immediate access to the full document without the need to open a new webpage.  Dexcom could have, but did not, place an advisal on the "Legal" screen comparable to the one in *Blizzard* urging users to read the terms of use or telling them the terms of use " 'CONTAINS A BINDING ARBITRATION AGREEMENT[.]' "  (*Ibid.*)

If anything, *Blizzard* serves to illustrate the ways in which Dexcom's "Legal" screen fell short of placing users on constructive notice that the Terms of Use were intended to govern all legal disputes arising from their relationship with Dexcom, or that such disputes would be subject to binding arbitration.  Again, " 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.' "  (*Long*, *supra*,

25

245 Cal.App.4th at p. 867, citing *Nguyen*, *supra*, 763 F.3d at p. 1179; accord, *Sellers*, *supra*, 73 Cal.App.5th at p. 476; *Weeks, supra,* 100 Cal.App.5th at p. 1086.) *Blizzard* illustrates the multitude of notice options that were available to Dexcom, and, correspondingly, the ways in which its screen failed to put users on notice of the terms to which they were to be bound.

In its supplemental brief, Dexcom contends sufficient notice was provided because users were "instructed by the G6 User Guide how to install and setup their G6 App, including by reviewing (and accepting) legal and safety information, which includes Dexcom's Terms of Use." Dexcom's argument, which is based on the content of Lovell's declaration, misstates the evidence. Lovell averred that the User Guide[10] "explains the steps that are required as part of the G6 App setup process" and that "the G6 App setup process requires the user to review legal and safety information, which includes acceptance of Dexcom's Terms of Use." This bare reference to a need to review legal information and accept Dexcom's Terms of Use does not, as Dexcom urges, provide the notice that was missing from the "Legal" screen. The title of the screen already conveyed that the subjects it covered were of a legal nature. The content of the screen presented the Terms of Use as serving a limited legal purpose. Lovell's averment does not establish that the

---

10    Although plaintiffs' complaints included a graphic of the Dexcom G6 apparently taken from the User Guide, and although Lovell's declaration briefly discussed the User Guide, the User Guide itself is not in the record before us. We also observe that Dexcom's argument assumes the User Guide is readily available to prospective G6 App users, a fact not established by Lovell's declaration. And at oral argument, Dexcom's counsel stated he did not believe the Terms of Use are provided to users with the Dexcom G6 device itself and acknowledged the record is devoid of evidence it is.

User Guide provided information sufficient to counter the misimpression created by the text on the "Legal" screen.

Dexcom also contends, based on *Meyer v. Uber Technologies, Inc.* (2d Cir. 2017) 868 F.3d 66 and *Blizzard, supra*, 76 Cal.App.5th 931, that the presence of an account login screen would have signaled to prospective G6 App users they were entering into a forward-looking relationship with Dexcom such that they reasonably should have expected to encounter significant terms and conditions. We disagree that the facts of this case are like *Meyer* and *Blizzard*. The user accounts in *Meyer* and *Blizzard* were accounts that served as platforms for *recurring financial transactions*—that is, exchanges of money for goods ("Loot Boxes") or services (Uber rides). (See *Meyer*, at p. 80; *Blizzard*, at pp. 936, 950–951; see also *Keebaugh v. Warner Bros. Entertainment* (9th Cir., Apr. 26, 2024, No 22-55982) ___ F.4th ___ [2024 WL 1819651, *9] [users of video game "are notified prior to downloading the game that the app offers in-app purchases" such that they are "playing a mobile game with potentially unlimited in-app purchases"].) Such accounts are "forward-looking" in the sense that they are created in anticipation of future financial transactions between the consumer and the provider. Here, Dexcom produced no evidence users had to enter financial information in order to create a Dexcom account, or that the Dexcom account served as a platform for recurring financial transactions between app users and Dexcom. The absence of such evidence distinguishes this case from *Meyer* and *Blizzard*.

And as described by Lovell, it was not the creation of the Dexcom account but the initial launch of the G6 App that triggered the requirement to accept Dexcom's Terms of Use. In other words, users were presented with the terms not as part of the Dexcom account creation process but as part of

27

the app launch process. This circumstance further distinguishes this case from *Meyer*, in which the acceptance of Uber's terms and conditions was directly linked to account registration. We thus disagree the presence of the account login screen would have signaled to users they were initiating a forward-looking relationship with Dexcom by launching the app and thus should expect to encounter significant terms and conditions.[11]

Further, as we have already noted, Dexcom presented no evidence prospective G6 App users were required to pay for the app. In this sense, the launch of the G6 App is comparable to the transaction in *Specht v. Netscape Communs. Corp* (2d Cir. 2002) 306 F.3d 17 (*Specht*), in which the plaintiffs downloaded free software from a provider's website. (See *id.* at pp. 21–22.) This court has characterized such a transaction as a limited one in which "the consumer 'is less likely to be looking for' contractual terms." (*Blizzard*, *supra*, 76 Cal.App.5th at p. 947, quoting *Sellers*, *supra*, 73 Cal.App.5th at p. 476.)

B.      *No Unambiguous Manifestation of Assent*

---

[11]     Although the trial court found the existence of such a forward-looking relationship in *Bottiglier*, its finding was based on a misunderstanding of the relevant transaction. The court stated Bottiglier had "signed up to use Dexcom's G6 Continuous Glucose Monitoring System" and construed this as a "transaction that clearly contemplated a 'continuing, forward-looking relationship.'" But Dexcom did not contend or present evidence that any of the plaintiffs, including Bottiglier, entered arbitration agreements when they "signed up to use" the Dexcom G6 device. Indeed, Dexcom presented no evidence that a person needed to "sign[ ] up" to use the device at all. Instead, Dexcom's claim was, and is, that arbitration agreements were formed with plaintiffs when they completed the setup process required to launch the G6 App on a mobile device for the first time. As we just explained, Dexcom did not establish this transaction constituted the initiation of the type of forward-looking relationship discussed in *Meyer* and *Blizzard*.

28

Not only does the content of the "Legal" screen fail to put users on inquiry notice of an arbitration provision, but it also fails to support the inference the act of clicking the checkbox next to "I agree to Terms of Use" is an unambiguous manifestation of assent to the full scope of terms in the hyperlinked webpage, including its arbitration provision. The text on the screen explicitly told users it meant something else: that "ticking the box[ ]" next to "I agree to Terms of Use" meant they understood their "personal information . . . w[ould] be collected, used and shared consistently with the . . . Terms of Use" and their personal information "w[ould] be stored and processed by Dexcom Inc. and/or its affiliate . . . in the United States, which may have different data protection laws than the country in which you reside." Although the checkbox at the bottom of the screen was next to the statement "I agree to Terms of Use" with its embedded hyperlink, at best, the close proximity of the checkbox to the hyperlink only gives rise to an inference the user who clicked the checkbox was agreeing to be bound by all terms in the hyperlinked terms, including the arbitration provision.

However, the "Legal" screen assigned two possible meanings to the act of clicking the checkbox—one narrow and explicit, the other broad and implicit. It therefore created ambiguity with respect to whether users who clicked on the checkbox next to "I agree to Terms of Use" were agreeing to have their personal information collected, used and shared "consistently with" the Terms of Use and stored and processed by Dexcom and/or its affiliate in the United States, or whether they were consenting to be bound by all of the terms in the hyperlinked webpage, including the requirement of binding arbitration in the event of a legal dispute arising from injuries allegedly caused by Dexcom's products. Under these circumstances, we cannot infer from the user's act of clicking the checkbox that the user and

29

Dexcom "agreed upon the same thing in the same sense." (*Sellers*, *supra*, 73 Cal.App.5th at p. 460 [cleaned up].)

Dexcom contends there is no such ambiguity because there is only one reasonable way to interpret the text on the "Legal" screen. According to Dexcom, in the first sentence, the user agrees to be bound by the Terms of Use accessible via the hyperlink at the bottom of the screen. In the next two sentences, the user agrees to the "***additional*** items" that are described in those sentences. Dexcom concludes its argument by asserting, "there is no way to read the meaning of checking a box next to the words 'I agree to Terms of Use' other than that the user 'agree[s] to Terms of Use.' "

We are not persuaded Dexcom has proposed a viable solution for the ambiguity problem we have identified. In essence, Dexcom contends the "Legal" screen should be interpreted to mean that when users click the box next to "I agree to Terms of Use," they are agreeing to all of the terms within the hyperlinked webpage as well as the "additional items" in the second and third sentences on the screen. But the language on the screen does not say this. Dexcom's undisclosed interpretation of what it means to click the checkbox is not relevant to determining what users intend to convey by taking that action. (See *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 [under California's objective approach, " '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation' "]; *Berman, supra*, 30 F.4th at p. 857 ["A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement."].)

30

We therefore conclude that the prospective G6 App user's act of clicking the box next to "I agree to Terms of Use" on the "Legal" screen cannot be taken as an unambiguous manifestation of assent to be bound by all of the terms in the hyperlinked Terms of Use webpage, including the arbitration provision.

C.    *Consequently, Dexcom Failed To Establish the Formation of Arbitration Agreements with Plaintiffs*

Because the process required to initially launch the G6 App neither placed prospective app users on constructive notice of the arbitration provision nor resulted in an unambiguous manifestation of assent to the provision, we conclude plaintiffs did not enter an agreement to arbitrate with Dexcom when they completed this process.  (See *Long*, *supra*, 245 Cal.App.4th at p. 865 [" '[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility' "], quoting *Specht, supra*, 306 F.3d at p. 35; accord, *Sellers*, *supra*, 73 Cal.App.5th at p. 469.)

In urging us to conclude binding arbitration agreements were formed during the G6 App setup process, Dexcom relies on cases that involved contractual terms accessible through visually conspicuous hyperlinks but which are otherwise distinguishable.  For example, Dexcom relies on two cases in which users were held to have entered arbitration agreements while creating and registering accounts with a telemedicine platform in order to receive clear-aligner orthodontic treatment via the internet.  (*Santana v. SmileDirectClub, LLC* (2023) 475 N.J. Super. 279 [applying New Jersey law]; *Navarro v. SmileDirectClub, Inc.* (N.D. Cal, June 1, 2022, No. 22-cv-00095-WHO) 2022 WL 1786582.)  But the transactions at issue here are materially different from the transactions at issue in the *SmileDirectClub* cases.  In the

31

*SmileDirectClub* cases, the terms and conditions that contained the arbitration provision were presented to the plaintiffs when they created and registered an account with the provider during an online registration process they were required to complete before they could access the provider's products or services. (See *Santana*, at p. 283; *Navarro*, at p. *1.) Here, by contrast, the arbitration provision was not presented to users during the primary transaction of acquiring the Dexcom G6 device, but rather in the secondary and optional transaction of installing the G6 App. In this context, users were less likely to anticipate encountering new contractual terms altering their legal rights in the event of a dispute with Dexcom.

Also, there was no evidence in the *SmileDirectClub* cases the screen with the clickwrap contained text that undermined the conclusion they were agreeing to the full scope of hyperlinked terms, including the arbitration provision. The remaining cases on which Dexcom relies are similarly distinguishable because the websites containing the hyperlinked terms did not have text creating ambiguity as to what the user was manifesting by clicking the associated button or checkbox, and the courts simply relied on the conspicuousness of the hyperlink in concluding sufficient notice of the terms was provided.[12]

---

[12] See *Patrick v. Running Warehouse, LLC* (9th Cir. 2024) 93 F.4th 468, 477 [website provided reasonably conspicuous notice of terms where hyperlink to terms appeared on an uncluttered page and was colored bright green against a white background and adjacent black text]; *Houtchens v. Google LLC* (N.D. Cal. 2023) 649 F.Supp.3d 933, 937 [website provided reasonably conspicuous notice of terms where the hyperlinks were in blue text in a sentence that otherwise used gray text and appeared on screens that were uncluttered]; *Hooper v. Jerry Ins. Agency, LLC* (N.D. Cal. 2023) 675 F.Supp.3d 1027, 1032, 1035 [website adequate to inform user she would be agreeing to hyperlinked terms, including arbitration provision, by clicking a

Here, the feature that defeats notice is a matter of content rather than design. Dexcom chose to include on its "Legal" screen language that explicitly told users clicking the box next to the Terms of Use hyperlink at the bottom of the screen meant they understood their personal information would be collected, used and shared "consistently with" the Terms of Use. Under these circumstances, the user's act of clicking the checkbox next to "I agree to Terms of Use" cannot be interpreted as an unambiguous manifestation of assent to be bound by the full scope of hyperlinked terms, including the arbitration provision. Therefore, no agreements to arbitrate were formed during the G6 App setup process.[13]

---

"Continue" button where the text directly underneath the button stated, "By clicking 'Continue' you agree to . . . the Jerry Terms of Use," and the phrase "Terms of Use" was a hyperlink written in bright pink font]; *S.S. by and through Stern v. Peloton Interactive, Inc.* (S.D. Cal. 2021) 566 F.Supp.3d 1019, 1040–1041 [impliedly accepting company's contention that a hyperlinked terms of use agreement containing an arbitration provision was sufficiently conspicuous such that the user manifested acceptance to it by clicking the associated checkbox].

[13] As an independent means of establishing contract formation, Dexcom argues that plaintiffs' counsel admitted the existence of arbitration agreements in all five cases. We disagree. "[A]n admission is not binding if it is made improvidently or unguardedly, or if it is in any way ambiguous[,]" or if, "[i]n context, the admission . . . lacks the gravity of a complete relinquishment of rights on the issue[.]" (*Irwin v. Pacific Southwest Airlines* (1982) 133 Cal.App.3d 709, 714.) In the *Herzog*, *Moore*, *Pierre*, and *Tsakiris* cases, the purported admission is a statement in the plaintiffs' opposition briefs to the effect that the plaintiff/decedent was required to "agree[ ] to the 'Terms of Use' Agreement that accompanied the device." The quoted statement was part of a narrative intended to illustrate the plaintiffs' lack of choice; in context, it lacks the gravity of a complete relinquishment of rights on the issue of contract formation. Moreover, counsel's statement cannot be taken as an unambiguous concession given that each opposition brief went on to present a developed argument urging the trial court to conclude "Dexcom

33

As a result, Dexcom failed to establish the existence of arbitration agreements with Hebert, Moore, Pierre, Tsakiris, or Bottiglier, and the trial court erred by granting Dexcom's motions to compel arbitration.  Aside from one issue we address below relating to the court's erroneous interpretation of the *Herzog* complaint, we need not and do not reach plaintiffs' remaining contentions regarding the date on which Tsakiris completed the G6 App setup process and the unconscionability of Dexcom's arbitration provision.[14]

## III.

### *This Court's Supplemental Briefing Order Was Proper*

Our dissenting colleague believes plaintiffs did not dispute the existence of an arbitration agreement in the trial court and that we have somehow transgressed our role as neutral arbiters by seeking supplemental briefing on the issue of whether ambiguity prevented formation of an

---

has failed to show the arbitration agreement was conspicuous and validly accepted by the [plaintiff/ decedent]."  And to the extent Dexcom contends plaintiffs' counsel also admitted the existence of arbitration agreements by stating during the motion hearing that for *Moore*, *Pierre*, and *Tsakiris*, "Dexcom did provide information seeming to indicate that the user had clicked on some information that would agree to the terms of the use on certain dates," we disagree this statement was an unambiguous concession that valid agreements had thereby been formed.

Finally, we reject Dexcom's contention that plaintiffs' counsel admitted the existence of an arbitration agreement by stating during the *Bottiglier* motion hearing that "a party knowingly and voluntarily entering into a contract [is bound] by those terms[.]"  This was a statement of an abstract proposition of law, not a concession that Bottiglier, specifically, entered a valid arbitration agreement.

[14]    Although Pierre asserted in her writ petition that Dexcom failed to establish she used the G6 App, in the consolidated reply filed on behalf of all plaintiffs, she withdrew this position.

arbitration agreement. (Dis. opn., at. pp. 3–5.) Neither of these assertions is true.

First, and contrary to the dissent's claim otherwise, the plaintiffs in *Herzog*, *Moore*, *Pierre*, and *Tsakiris* did in fact dispute the existence of agreements to arbitrate. Each of their opposition briefs contained an identical, fully developed argument based on *Long*, *supra*, 245 Cal.App.4th 855.[15] *Long* held that Terms of Use hyperlinks on a defendant's website failed to satisfy the California standard for internet contract formation, which requires " '[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms.' " (See *id*. at pp. 865–866, quoting *Specht*, *supra*, 306 F.3d at p. 35.) Plaintiffs argued, among other things, that *Long* was "exactly on point with the case at bar" and that "Dexcom has failed to show the arbitration agreement was conspicuous and validly accepted by the [plaintiffs]." In *Bottiglier*, the plaintiff's arguments differed but she nevertheless asserted an agreement to arbitrate had not been formed.

And in resolving the disputed formation issue, the trial court expressly applied this court's internet contract formation test to Dexcom's moving evidence. (*Sellers*, *supra*, 73 Cal.App.5th at p. 461 ["[I]n order to establish

_____

15    Although plaintiffs did not raise their formation arguments under a separate heading, the civil rule governing the content of trial court memoranda does not require this. (See Cal. Rules of Court, rule 3.1113(b) [governing contents of memorandum; providing that "[t]he memorandum must contain a statement of facts, a concise statement of the law, evidence and arguments relied on, and a discussion of the statutes, cases, and textbooks cited in support of the position advanced"]; cf. *id*., rule 8.204(a)(1)(B) [governing contents of appellate briefs; providing that "[e]ach brief must: . . . [s]tate each point under a separate heading"].)

mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms when checking a box or clicking on a button."].)  Thus, the existence of an arbitration agreement, including both the existence of mutual assent and the question of whether Dexcom's G6 App startup wizard screen demonstrated mutual assent, was raised in the trial court in all of the cases before us.

Second, in each of their petitions, plaintiffs have challenged the conclusion that they agreed to arbitrate, and Dexcom has responded by arguing they entered valid clickwrap agreements when they checked the box on the G6 App startup wizard "Legal" screen.  Dexcom's contract formation theory relies on the G6 App "Legal" screen such that the existence of an arbitration agreement presents an issue of law.  Every court that has examined whether a contract was formed by a user's actions on a website has considered the content of that website.  (See e.g. *Specht*, *supra*, 306 F.3d at pp. 31–32; *Long*, *supra*, 245 Cal.App.4th at pp. 865–867; *Sellers*, *supra*, 73 Cal.App.5th at pp. 477–480; *Blizzard*, *supra*, 76 Cal.App.5th at pp. 950–954.)  Although neither the parties nor the trial court specifically discussed the significance of the text on the "Legal" screen, our analysis of the issue would have been incomplete had we decided the issue based on the color of the text while ignoring its meaning.

Thus, contrary to the dissent's perspective, in our view it was entirely appropriate for this court to issue a supplemental briefing order directing the parties to address the significance of the text on the screen even though the precise issue was not previously considered.  "[S]upplemental briefing is proper when a court wishes to consider a point of law following the regular

36

briefing of a case on appeal." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 24 (*Waller*); see Gov. Code, § 68081 [authorizing courts to decide issues not initially proposed or briefed after "afford[ing] the parties an opportunity to present their views on the matter through supplemental briefing"]; *People v. Alice* (2007) 41 Cal.4th 668, 674 (*Alice*) [appellate court has a duty " 'to allow supplemental briefing before it renders a decision which was not proposed or briefed by any party"].) Indeed, this court has previously reversed an order denying arbitration after soliciting supplemental briefing on a dispositive issue "mentioned only in passing in defendants' briefs." (*Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 612, fn. 4.) "[T]his court has the discretion to consider a theory presented for the first time on appeal when that theory involves only a legal question determinable from the uncontroverted facts and those facts could not have been altered by the presentation of additional evidence."[16] (*County of Kern v. T.C.E.F., Inc.*

_____

[16] Citing *Esparza v. KS Industries, L.P.* (2017) 13 Cal.App.5th 1228, 1237–1238, the dissent speculates that Dexcom's User Guide is evidence potentially "clear[ing] up the ambiguity." (Dis. opn., at pp. 5–6, fn. 4.) It identifies this imagined possibility as a reason we cannot be sure our decision would not be altered by additional evidence, such that this court supposedly erred in issuing its supplemental briefing order. The dissent's reasoning is flawed. *Esparza* addresses ambiguity in a written agreement and the availability of parol evidence to clarify whether an arbitration clause lacked mutuality. (*Esparza*, at pp. 1237–1238.) That is not the ambiguity at issue here. Rather, when determining whether a contract was formed by a user's actions on a given website (here, clicking on a checkbox), courts are required to evaluate whether those actions constitute an unambiguous manifestation of assent to the website's terms. (See e.g. *Specht*, *supra*, 306 F.3d at p. 31; *Sellers*, *supra*, 73 Cal.App.5th at p. 460.) Thus the only way the User Guide could conceivably resolve the ambiguity created by the text on the "Legal" screen is if (1) it contained a single, coherent explanation of what it meant for the user to click the checkbox on the "Legal" screen, and (2) Dexcom produced evidence the plaintiffs actually read *and relied on* the hypothetical portions of

37

(2016) 246 Cal.App.4th 301, 326; see *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party" and "[w]hether or not it should do so is entrusted to its discretion"]; *Mitchell v. Atwell Island Water Dist.* (2020) 45 Cal.App.5th 624, 634 [deciding appeal based on a ground that was not relied on by the trial court after soliciting and receiving supplemental briefing].) It was therefore entirely proper for this court to seek supplemental briefing.[17]

---

the User Guide, and *not* the text on the "Legal" screen, when they clicked the checkbox on the screen. This is an exceedingly unlikely scenario. Moreover, in response to the supplemental briefing order, Dexcom itself did not claim the User Guide would clarify the ambiguity created by the text on the screen. Indeed, although it requested leave to supplement the record to introduce evidence on another issue, it did not do so on this question. Accordingly, we disagree with the dissent.

[17] In claiming that we have somehow usurped our proper role by issuing a supplemental briefing order seeking the parties' input on relevant points of law that had not yet been briefed, the dissent relies on inapposite cases and in doing so appears to misapprehend the relevant procedural context as well as the governing law. (See dis. opn., at p. 5, citing *Gonzalez v. Commission on Judicial Performance* (1983) 33 Cal.3d 359, 371, fn. 6 [stating that a trial court's "extended and improper examination of witnesses . . . places the judge in the role of advocate and may detract from the public image of the court as an impartial tribunal"]; *In re G.B.* (2018) 28 Cal.App.5th 475, 488 [a juvenile court "lacks the authority to, on its own motion, initiate dependency proceedings against a parent" and exceeds its role as impartial arbiter by doing so].) Unlike these cases, here the relevant authorities hold that "supplemental briefing *is proper* when a court wishes to consider a point of law following the regular briefing of a case on appeal." (*Waller*, *supra*, 11 Cal.4th at p. 24, italics added; see Gov. Code, § 68081.) Courts of review err not by deciding new legal issues, but by doing so without providing the parties the opportunity to brief them. (*Alice*, *supra*, 41 Cal.4th at pp. 677–679.)

IV.

*As to Herzog, Dexcom Also Failed To Establish the Decedent Used the G6 App*

In *Herzog*, Dexcom was unable to establish that its business records showed when (and if) the decedent, Hebert, completed the G6 App setup process.  Instead, it claimed the *Herzog* plaintiffs alleged in their complaint that Hebert had used the G6 App and argued he could not have done so without completing the G6 App setup process and accepting Dexcom's terms of use, including the arbitration provision.  In ruling that Dexcom proved the existence of an agreement to arbitrate in *Herzog*, the trial court implicitly accepted Dexcom's interpretation of the plaintiffs' complaint.

In their writ petition, the *Herzog* plaintiffs contend they did not allege Hebert used the G6 App, and Dexcom's claim to the contrary relied on a misinterpretation of their complaint.  We have independently considered the allegations relied on by Dexcom, and we agree with the plaintiffs.  (See e.g. *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [appellate courts interpret writings de novo]; *Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010 [the legal effect of a pleading is determined de novo].)

None of the allegations relied on by Dexcom contain an affirmative factual admission that Hebert used the G6 App.  In the parts of the complaint

---

And to the extent the dissent further suggests that our result "is contrary to the strong public policy in favor of arbitration" and "manifests . . . judicial hostility" to that policy (dis. opn., at pp. 12–13), there is no such public policy where, as here, there is no agreement to arbitrate (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 739 ["judicial enthusiasm for alternative methods of dispute resolution must not in all contexts override the rules governing the interpretation of contracts"]; *ibid.* [" 'the policy favoring arbitration cannot displace the necessity for a voluntary *agreement* to arbitrate' "]).

cited by Dexcom, plaintiffs alleged that in addition to the Dexcom G6 device (which they called "the G6 System"), Dexcom "*also* designs, develops, manufactures, promotes, and supplies [*sic*] Dexcom G6 software application (hereinafter 'G6 App')." (Italics added.) They later alleged that "[d]uring the relevant time, Decedent used Dexcom's software to obtain and review glucose information from the G6 System."

Dexcom contends plaintiffs admitted Hebert's G6 App use by alleging he used "the G6 System," which the plaintiffs purportedly "defined to include a receiver/smart device and software that they identified as the G6 App." (Boldface omitted.) We disagree. Plaintiffs did not define the "G6 System" (i.e., the Dexcom G6 device) to include the G6 App. Rather, they alleged that in addition to the Dexcom G6, Dexcom "also" supplies the G6 App. By using the connecting word "also," they identified the G6 App as an item that stood apart from the Dexcom G6 device. Nor did plaintiffs define "G6 App" to mean any Dexcom software. Rather, they defined the G6 App as a "Dexcom G6 software application." Plaintiffs' subsequent, unspecified reference to Hebert's use of "Dexcom's software" cannot be taken as an admission he specifically used the G6 App.[18]

---

[18] The dissent concludes that the G6 App is the only software mentioned in the complaint and that any reference to Dexcom's software must therefore be a reference to the G6 App. (Dis. opn., at p. 8, fn. 5.) We disagree. This conclusion ignores that Dexcom's own "Legal" screen distinguishes Dexcom's "mobile application[s]" from its "software platform[s]," which tends to indicate Dexcom supplies software other than just the mobile app. It also ignores the complaint's allegations, which specifically define "G6 App" to mean the "G6 software application." The *Herzog* plaintiffs merely alleged that Hebert used "Dexcom's software"; they did not allege that he used the G6 App. By employing the generic word "software" rather than their defined term "G6 App," the plaintiffs conveyed that the "software" they were referring to was something other than the G6 App.

In its return, Dexcom argues the *Herzog* plaintiffs admitted Hebert's G6 App use by alleging in their complaint that Hebert "reasonably relied on Dexcom's representations as to the G6 System and the G6 App's accuracy and efficacy." We again disagree. First, that Hebert allegedly relied on Dexcom's representations about the G6 App does not establish he actually used the G6 App. Second, the quoted allegation is a mixed factual and legal conclusion and therefore cannot be considered a binding judicial admission. (*Castillo v. Barrera* (2007) 146 Cal.App.4th 1317, 1324.)

Further, even if we were to agree with Dexcom that the *Herzog* complaint contains allegations admitting Hebert's use of the G6 App, this would not establish all of the facts necessary to prove he agreed to arbitration. To prove an arbitration agreement was formed when Hebert completed the G6 App setup process, Dexcom must establish the parties "agreed upon the same thing in the same sense." (*Avery, supra*, 218 Cal.App.4th at p. 68.) "[I]t is not sufficient for the party seeking to compel arbitration to show the parties generally agreed to arbitrate their disputes by incorporating some arbitration provision into their contract. Rather, the party must establish the precise arbitration provision the parties incorporated into their agreement to govern their disputes." (*Ibid.*)

Here, Lovell's declaration established only that the Terms of Use contained arbitration provisions during three periods of time. Therefore, the date of completion of the G6 App setup process was an essential component of Dexcom's contract formation theory. To establish that an agreement to arbitrate was formed with Hebert when he purportedly finished setting up the G6 App on a mobile phone, Dexcom needed to show he completed the setup process during the operative period of one of the versions of the Terms of Use attached to Lovell's declaration. Plaintiffs' complaint does not supply

41

the date when Hebert completed the app setup process.  Therefore, it does not suffice to establish that he agreed to arbitration.  (*Avery, supra*, 218 Cal.App.4th at p. 68.)

## DISPOSITION

The order to show cause is discharged, and the petitions are granted. Let a peremptory writ of mandate issue directing the trial court to vacate its orders compelling arbitration, and to enter new and different orders denying the motions to compel arbitration.  Plaintiffs are entitled to recover their costs incurred in this writ proceeding.  (Cal. Rules of Court, rule 8.278(a)(1).)

DO, J.

I CONCUR:

KELETY, J.

Irion, Acting P. J., Dissenting.

I disagree with the majority's decision to grant relief in these consolidated writ proceedings.  No plaintiff presented to the trial court the contract formation theory the majority uses to overturn the orders granting the motions of Dexcom, Inc. (Dexcom) to compel arbitration, and in my view that theory is flawed.  I think the trial court correctly rejected the grounds on which plaintiffs opposed to the motions.  I would deny the petitions.

I

I accept the majority's summary of the factual and procedural background of the underlying litigation, with the exceptions of footnotes 4 and 5.  The majority does not describe the papers plaintiffs filed in opposition to Dexcom's motions to compel arbitration.  Because their content is important to my analysis, I provide a brief description.

Lara Herzog and Melanie Samora, who represent their deceased father, Henry J. Hebert,[1] opposed Dexcom's motion solely on the ground the arbitration agreement was unconscionable.  They stated in their opposition that Dexcom "failed to put forth any evidence [Hebert] agreed to the arbitration clause in this case," but they presented no evidence or separate legal argument on contract formation.  Herzog and Samora also stated in the opposition that to use the Dexcom G6 Continuous Glucose Monitoring System (the Dexcom G6), Hebert "had to follow certain steps in order to activate and use the G6 System, which included creating a Dexcom account and agreeing to the 'Terms of Use' Agreement . . . that accompanied the device," and that he "began using the Dexcom G6 System."  These statements were consistent

---

[1]     Subsequent references to "plaintiffs" should be taken to include Hebert when the context indicates the reference is to him rather than to Herzog and Samora.

with allegations Herzog and Samora had made in their complaint. They submitted no declarations, but attached a copy of the Terms of Use to their opposition memorandum.

The opposition papers filed by Traci Moore, Tiffanie Tsakiris, and Aliya Campbell Pierre were substantially the same as those filed by Herzog and Samora. Moore, Tsakiris, and Pierre each acknowledged having to agree to the Terms of Use, including the arbitration agreement, as part of the process of creating a Dexcom account and using the Dexcom G6. Each of these plaintiffs also opposed enforcement of the arbitration agreement only on the ground it was unconscionable. None submitted a declaration or any other evidence in opposition to the motion to compel arbitration, but each attached a copy of the Terms of Use to her opposition memorandum.

Brenda Bottiglier's opposition was different. She argued there was no valid agreement to arbitrate, because she never read the Terms of Use and, even if she had, she would not have known what arbitration was or how it affected her legal rights. Bottiglier also argued the arbitration agreement was unenforceable, because it exceeded her reasonable expectations and was otherwise unconscionable. Unlike the other plaintiffs, Bottiglier submitted a declaration as part of her opposition. She said: (1) she relied on her doctor's expertise in prescribing the Dexcom G6; (2) nobody told her an arbitration agreement was associated with the Dexcom G6; (3) she used the G6 CGM Mobile Application (the G6 App) but never read the Terms of Use; and (4) had she read them, she would not have known what arbitration was or how it affected her legal rights. Bottiglier also attached a copy of the Terms of Use to her opposition memorandum.

2

## II

The majority bases its decision to grant writ relief on the ground that an ambiguity in the content of the Legal webpage presented to Dexcom G6 users when they initially launch the G6 App prevents formation of an arbitration agreement between users and Dexcom.  According to the majority, the inclusion on that page of two sentences about use of sensitive health information prevents users who tick the box next to "I agree to Terms of Use" from knowing whether they are agreeing only as to use of sensitive health information or as to all terms included in the hyperlinked webpage.  (Maj. opn., *ante*, pp. 28–31.)  Based on this purported uncertainty, the majority concludes that ticking the box "cannot be taken as an unambiguous manifestation of assent to be bound by all of the terms of the hyperlinked Terms of Use webpage, including the arbitration provision."  (Maj. opn., *ante*, pp. 30–31.)  For two independent reasons, I disagree with the majority's decision to grant writ relief on this ground.

## A

One reason I object to the majority's use of the theory that an ambiguity prevented formation of an arbitration agreement as the basis for granting writ relief is that no party ever presented that theory to the trial court.  A reviewing court generally does not allow a party to argue one theory in the trial court and then argue a different theory in the reviewing court, because to do so would be unfair to the opposing party and to the trial court. (*Ernst v. Searle* (1933) 218 Cal. 233, 240–241; *Mireskandari v. Gallagher* (2020) 59 Cal.App.5th 346, 371; *Humane Society of U.S. v. Superior Court* (2013) 214 Cal.App.4th 1233, 1272–1273; see *Mosby v. Superior Court* (1974) 43 Cal.App.3d 219, 228 ["Contentions not presented to the trial court may not be raised here for the first time."].)  None of the plaintiffs opposed Dexcom's

3

motions to compel arbitration on the ground that the two sentences about use of sensitive health information that appeared on the Legal webpage when the G6 App was initially launched created an ambiguity that prevented formation of an arbitration agreement.  Herzog, Samora, Moore, Tsakiris, and Pierre did not dispute the existence of an arbitration agreement; they opposed the motion solely on the ground the arbitration agreement was unconscionable.[2]  Bottiglier argued there was no arbitration agreement, but only on the ground she had not read the Terms of Use and did not know what arbitration meant.[3]  Any claim that ambiguity in the content of the Legal page prevented contract formation was forfeited by failure of any plaintiff to raise it in the trial court.  (*GRFCO, Inc. v. Superior Court* (2023) 89 Cal.App.5th 1295, 1312–1313; *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 700.)

The theory that an ambiguity prevented formation of an arbitration agreement was not raised in any of the writ petitions filed in this court

---

[2]    The majority asserts these plaintiffs "did in fact dispute the existence of agreements to arbitrate" by including in their opposition memoranda "an identical, fully developed argument based on *Long* [*v. Provide Commerce, Inc.* (2016)] 245 Cal.App.4th 855."  (Maj. opn., *ante*, pp. 34–35.)  I do not think that is a fair characterization of the record.  Plaintiffs cited *Long* for the point that the arbitration provision in the Terms of Use was not conspicuous, and they did so in a paragraph that was part of a legal argument under the heading "**THE ARBITRATION PROVISION IS PROCEDURALLY UNCONSCIONABLE**" and subheading "**Oppression**."  Nowhere in their memoranda did plaintiffs set out a separate argument that no arbitration agreement existed.

[3]    Bottiglier did not renew the argument in her writ petition.  I deem it abandoned and do not discuss it further.  (*Joshi v. Fitness Internat., LLC* (2022) 80 Cal.App.5th 814, 826; *Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 106, fn. 17.)

4

either. All plaintiffs challenged the order compelling arbitration on the same three grounds: The arbitration agreement (1) was not voluntary, (2) exceeds their reasonable expectations, and (3) is unconscionable. No plaintiff mentioned any ambiguity that purportedly prevented formation of an arbitration agreement. The first suggestion of such an ambiguity was by this court in its order directing the parties to file supplemental briefs on whether the sentences about use of sensitive health information that appear on the Legal webpage when a user initially launches the G6 App "create[ ] ambiguity with respect to whether ticking the box next to the phrase 'Terms of Use' is an indication of assent to the terms in the hyperlinked 22-page 'DEXCOM TERMS OF USE' document." In my view, "[i]t is not this court's role to construct arguments that would undermine the lower court's judgment and defeat the presumption of correctness." (*Needelman v. DeWolf Realty Co., Inc.* (2015) 239 Cal.App.4th 750, 762.) To avoid the appearance of acting as an advocate for a party, a court generally should leave the selection of the issues to be raised to the parties and confine itself to consideration of those issues. (See, e.g., *Gonzalez v. Commission on Judicial Performance* (1983) 33 Cal.3d 359, 371, fn. 6; *In re G.B.* (2018) 28 Cal.App.5th 475, 487.) Respectfully, I believe this court went beyond its proper role of neutral decisionmaker by suggesting a new ground on which plaintiffs could challenge the trial court's orders compelling arbitration and then adopting that ground as the basis for its decision to overturn those orders.[4]

---

[4] I of course agree with the majority that we have discretion to order supplemental briefing on a legal point not adequately covered by the regular briefing (see maj. opn., *ante*, pp. 36–38), but I disagree the supplemental briefing ordered in this case was appropriate. In my view, we should not raise a new legal theory unless (1) it is potentially dispositive of an issue properly before us, (2) we can decide the issue based on the existing record,

B

I also disagree with the majority's conclusion that Dexcom did not establish the existence of arbitration agreements binding on plaintiffs because, the majority says, ambiguity in the content of the Legal webpage presented to Dexcom G6 users upon initial launch of the G6 App prevented formation of the agreements.  Formation of any agreement requires the mutual consent of the parties.  (Civ. Code, §§ 1550, subd. 2, 1565, subd. 2.)  "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." (*Id.*, § 1580.)  Whether there has been consent sufficient to form a contract is determined "by the use of an objective test," namely, whether the parties' words or conduct reasonably manifested mutual assent. (*Russell v. Union Oil Co.* (1970) 7 Cal.App.3d 110, 114; accord, *Moritz v. Universal City Studios LLC* (2020) 54 Cal.App.5th 238, 246.)  "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811.)  The party seeking to enforce an arbitration agreement has the

---

and (3) we can be sure our decision would not be altered by presentation of additional evidence.  (See, e.g., *Esparza v. KS Industries, L.P.* (2017) 13 Cal.App.5th 1228, 1237–1238.)  I am not satisfied the third criterion is met here.  Plaintiffs' complaints mention a User Guide that apparently accompanied the Dexcom G6, and Lovell stated in his declarations that "[t]he User Guide explains the steps that are required as part of the G6 App setup process."  The User Guide is not in the record, however, and so we do not know what information, if any, it provided users about the Terms of Use in general or the arbitration provision in particular.  Had plaintiffs made the argument that ambiguity in the Legal webpage prevented the mutual assent needed for formation of the arbitration agreement, Dexcom might have submitted to the trial court the User Guide or some other evidence to clear up the ambiguity.

6

burden to prove its existence. (Code Civ. Proc., § 1281.2; *Engalla v. Permanente Medical Group* (1997) 15 Cal.4th 951, 972 (*Engalla*).) As I shall explain, Dexcom sustained its burden as to all plaintiffs to show mutual consent to the arbitration provision of the Terms of Use.

1

In support of each of its motions to compel arbitration, Dexcom submitted a declaration from Eric Lovell, a senior manager of data privacy at Dexcom, who described the process required for a Dexcom G6 user to set up an account and use the G6 App on the user's personal mobile device. One step required the user to tick a box next to the statement, "I agree to Terms of Use," that appeared on a webpage titled "Legal." The words "Terms of Use" appeared in green against a white background and constituted a hyperlink that, if clicked, would display the Terms of Use. Lovell stated a Dexcom G6 user cannot use the G6 App without accepting the Terms of Use. He attached to his declaration copies of three versions of the Terms of Use, which were in effect at different times starting from September 18, 2018. Each version contained the same provision requiring binding arbitration of "all disputes arising out of or related to this Agreement or any aspect of the relationship between you and Dexcom," except for small claims court disputes. (Capitalization altered.) Lovell also attached a screen shot depicting the Legal page presented to a user upon initial launch of the G6 App. As to Moore, Tsakiris, and Bottiglier, Lovell stated the date on which Dexcom's business records showed each had completed the G6 App set up and accepted the Terms of Use. Lovell did not supply similar information for Hebert (Herzog and Samora's decedent) or Pierre. To establish an arbitration agreement with them, Dexcom instead relied on the statement in Lovell's declaration that the G6 App cannot be used without acceptance of the Terms

7

of Use and allegations in the complaints that Hebert and Pierre used the G6 App.  (See maj. opn., *ante*, pp. 5–11.)[5]

The evidence of the use of the G6 App by plaintiffs sufficed to establish mutual assent to the arbitration provision in Dexcom's Terms of Use.  An enforceable agreement is formed online when a website provides reasonably conspicuous notice of the terms to which a consumer will be bound and the consumer takes some action, such as clicking a button or ticking a box, that unambiguously manifests assent to the terms.  (*Patrick v. Running Warehouse, LLC* (9th Cir. 2024) 93 F.4th 468, 476 [applying California law]; *Houtchens v. Google LLC* (N.D.Cal. 2023) 649 F.Supp.3d 933, 939–942 [same]; *B.D. v. Blizzard Entertainment, Inc.* (2022) 76 Cal.App.5th 931, 944, 954.)  The first sentence on the Legal webpage a user sees upon initial launch of the G6 App states:  "You understand and agree that your use of this website or any DexCom, Inc. mobile application or software platform for your DexCom continuous glucose monitor is subject to the Terms of Use, Privacy

---

[5] Herzog and Samora alleged that Dexcom "designs, develops, manufactures, promotes and supplies Dexcom G6 software application (hereinafter 'G6 App') for either its own local receiver or for smartphones and smartwatches like iPhones, Apple Watch and Android devices.  The G6 App enables the G6 System users to use their smart devices as the display device to receive real-time blood glucose readings, notifications and sound alarms related to potential hyperglycemic and hypoglycemic events."  (Fn. omitted.)  They also alleged their decedent (Hebert) "used Dexcom's software to obtain and review glucose information from the G6 System."  The only software mentioned in the complaint is the G6 App.  Pierre and the other plaintiffs made the same allegations regarding their use of the G6 App.  These allegations bind plaintiffs.  (*Brown v. Aguilar* (1927) 202 Cal. 143, 149; *Shirvanyan v. Los Angeles Community College Dist.* (2020) 59 Cal.App.5th 82, 100; *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271.)  I disagree with the majority's contrary conclusion.  (Maj. opn., *ante*, pp. 39–41.)

Policy and any other acknowledgment listed below." Lower on the page and next to a box to be ticked is the statement, "I agree to Terms of Use." The page has many features of webpages courts have determined provided reasonably conspicuous notice of contractual terms. The words "Terms of Use": (1) are set out in a contrasting color (green against a white background with otherwise black text); (2) constitute a hyperlink that, if clicked, would display the Terms of Use; (3) appear next to a box the user must tick to accept them; and (4) are unobscured on a page that is uncluttered. (*Keebaugh v. Warner Bros. Entertainment Inc.* (9th Cir. 2024) ___ F.4th ___, ___ [2024 WL 1819651, p. *10]; *Patrick*, at p. 477; *Houtchens*, at pp. 941–942; *Blizzard*, at p. 951.) Moreover, use of the G6 App requires establishment of a user account and download of the G6 App and involves transmission of blood glucose levels, which the user must track for a lifetime. Such circumstances make it " 'reasonable to expect that the typical consumer . . . contemplates entering into a continuing, forward-looking relationship' governed by terms and conditions." (*Blizzard*, at p. 951; *Keebaugh*, at p. ___ [2024 WL 1819651, p. *10] ["the entire point of the download is to have continued access to [blood glucose level]"]. I thus conclude that by using the G6 App, which required ticking the box next to "I agree to Terms of Use," plaintiffs unambiguously manifested their assent to the Terms of Use, including the agreement to arbitrate disputes with Dexcom. (*Patrick*, at p. 477; *Houtchens*, at p. 942; *Blizzard*, at p. 951.)[6]

---

[6] Hebert's agreement to arbitrate with Dexcom is binding on Herzog and Samora to the extent they assert claims that would belong to Hebert had he not died. (See *Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 613, fn. 5 [successor in interest is bound by decedent's arbitration agreement].)

9

The majority reaches the opposite conclusion by claiming the Legal webpage was ambiguous about whether ticking the box next to "I agree to Terms of Use" meant the user agreed to all Terms of Use, including the arbitration provision, or agreed only to have personal information used in accordance with the Terms of Use. (Maj. opn., *ante*, pp. 28–31.) Relying on *Sgouros v. TransUnion Corp.* (7th Cir. 2016) 817 F.3d 1029, 1036 (*Sgouros*), the majority says Dexcom " 'undid whatever notice it might have been furnishing' " about the arbitration provision in the Terms of Use and " 'distracted' " the user from that provision by stating on the Legal page that ticking the boxes next to "I agree to Terms of Use" and "I agree to Privacy Policy" meant the user understood that personal information would be used consistently with the Privacy Policy and Terms of Use. (Maj. opn., *ante*, p. 24.) According to the majority, a user who ticked the boxes might have agreed not to all the Terms of Use but only to those governing use of personal information. (Maj. opn., *ante*, p. 29.) For there to be ambiguity, however, the language used must be reasonably susceptible to more than one meaning. (*Breathe Southern California v. American Lung Assn.* (2023) 88 Cal.App.5th 1172, 1181; *Curry v. Moody* (1995) 40 Cal.App.4th 1547, 1552.) I do not think the language on the Legal page, considered as a whole, is reasonably susceptible to the meaning the majority gives it.

The Legal webpage contains three sentences of text followed by two clearly set out boxes, one next to "I agree to Terms of Use" and the other next to "I agree to Privacy Policy," and below them is a "Submit" button. (Maj. opn., *ante*, p. 7.) The first of the three sentences of text tells the user that use of the G6 App "is subject to the Terms of Use . . . listed below." (Maj. opn., *ante*, p. 7.) The statements next to the boxes below the text have embedded

hyperlinks that, if clicked, take the user to webpages that display the Terms of Use or Privacy Policy. (Maj. opn., *ante*, p. 7.) By clicking the hyperlink to the Terms of Use, the user would quickly learn they "CONTAIN[ ] A MANDATORY ARBITRATION OF DISPUTES PROVISION." (Maj. opn., *ante*, pp. 8–9 & fn. 3.) I conclude a reasonable user who ticked the box next to "I agree to Terms of Use" and clicked the Submit button would know that doing so constituted consent to all Terms of Use, including the arbitration provision.

Dexcom neither " 'undid' " notice of the arbitration provision nor " 'distracted' " the user from it (maj. opn., *ante*, p. 24) by also notifying the user in the second sentence of text on the Legal webpage that by ticking the box next to "I agree to Terms of Use" the user acknowledged personal information would be handled in accordance with the Terms of Use. That notification contained no words of limitation (e.g., exclusively, limited to, only, solely) that would restrict the subject matter to which the Terms of Use applied to anything narrower than the uses mentioned in the first sentence. (See *Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 194 [court may not insert limiting language under guise of interpretation].) Rather, it provided as an example of what was subject to the Term of Use a topic likely to be of concern to a user of software to receive data from a continuous glucose monitoring device, namely, collection and sharing of "sensitive health information."

The Legal webpage is unlike the website at issue in *Sgouros*, *supra*, 817 F.3d 1029, on which the majority relies. The website in that case contained a Service Agreement in a scroll window, and under that window was an advisement that made no mention of the Service Agreement and told the user that by clicking a button, which also did not mention the Service

11

Agreement, the user authorized the website operator to obtain the user's personal credit information. (*Id.* at pp. 1032–1033.) Here, by contrast, the Legal page included the prominently displayed statement, "I agree to Terms of Use," with an embedded hyperlink to the Terms of Use, and placed next to that statement a box the user had to tick to launch the G6 App. (Maj. opn., *ante*, pp. 6–7.) To borrow language from *Sgouros*, "A website might be able to bind users to [Terms of Use] by placing . . . a clearly labeled hyperlink to [them] next to an 'I Accept' button that unambiguously pertains to [them]." (*Sgouros*, at p. 1036.) As I read *Sgouros*, it does not support the majority's conclusion that by ticking the box next to "I agree to Terms of Use," the user did not assent to all Terms of Use, including the arbitration provision.[7]

I disagree with the majority's conclusion for two additional reasons. First, it runs afoul of the rule that we should, if possible, interpret language to give effect to a contract rather than to make it void. (Civ. Code, §§ 1643, 3541; *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 953–954; *Koenig v. Warner Unified School Dist.* (2019) 41 Cal.App.5th 43, 55.) My interpretation of the Legal webpage upholds the arbitration agreement; the majority's nullifies it. Second, the majority's conclusion is contrary to the

---

[7]     I also do not think the other case on which the majority heavily relies, *Doe v. Massage Envy Franchising, LLC* (2022) 87 Cal.App.5th 23 (see maj. opn., *ante*, pp. 22–23), supports its conclusion. Although I perceive many other significant differences between *Doe* and the cases before this court, two suffice to explain why there was no contract formation in *Doe* but there was in the cases before this court. In *Doe*, the " 'Terms of Use Agreement' " that contained the arbitration clause "was never called out or identified" and "was referenced in an inconspicuous hyperlink" at the end of another form. (*Id.* at p. 34.) In the cases before this court, the user's agreement to the Terms of Use was mentioned in the first sentence of the Legal webpage, and the Terms of Use were accessible by clicking a prominent hyperlink embedded in the statement, "I agree to Terms of Use."

strong public policy in favor of arbitration as an expeditious and cost-effective form of dispute resolution.  (See, e.g., *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9; *McConnell v. Advantest America, Inc.* (2023) 92 Cal.App.5th 596, 607.)  In accordance with that policy, " 'any doubts regarding the validity of an arbitration agreement are resolved in favor of arbitration.' " (*Nguyen v. Applied Medical Resources Corp.* (2016) 4 Cal.App.5th 232, 247; accord, *Farrar v. Direct Commerce, Inc.* (2017) 9 Cal.App.5th 1257, 1266.)  The majority's resolution of the purported ambiguity in the Legal webpage against formation of arbitration agreements binding on plaintiffs is, in my view, inconsistent with the policy in favor of arbitration and instead manifests the judicial hostility to arbitration that federal and state laws requiring enforcement of arbitration agreements were intended to overcome. (See, e.g., *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639, 649; *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1074.)

### III

Having concluded Dexcom met its burden to prove the existence of an arbitration agreement binding on each plaintiff, I must now address the sole defense each raised against enforcement of the agreement in the trial court and renews in this court, namely, the agreement is unconscionable.  As I explain below, the trial court correctly rejected that defense.

### A

"A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party." (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125 (*OTO*).)  To prevail on an unconscionability defense, a party must establish both a procedural element and a substantive element. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th

13

83, 114.) "The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. [Citations.] Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246.) Although both elements must be present for a court to refuse to enforce a contract or provision, "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz*, at p. 114.) The party opposing enforcement of an arbitration agreement bears the burden to prove it is unconscionable. (*Engalla*, *supra*, 15 Cal.4th at p. 972; *Hasty v. American Automobile Assn. etc.* (2023) 98 Cal.App.5th 1041, 1054.)

B

Plaintiffs contend the arbitration provision in Dexcom's Terms of Use is procedurally unconscionable because they could neither negotiate nor reject the provision and still use the G6 App. They claim they had no realistic choice but to use the Dexcom G6 as prescribed by their doctors for management of their serious and chronic illness (diabetes mellitus), and they had no reason to suspect that following their doctors' orders would require them to arbitrate disputes with Dexcom. Plaintiffs contend they are like the patient in *Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345 (*Wheeler*)), who the Court of Appeal held was not bound by a provision requiring arbitration of medical malpractice claims contained in a form he signed to gain admission to a hospital when the hospital had neither called the provision to his attention nor explained it to him. I find these contentions unpersuasive.

14

"A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion.' " (*OTO*, *supra*, 8 Cal.5th at p. 126.) A contract of adhesion is a standardized contract prepared by the party with superior bargaining power and offered to the other party on a take-it-or-leave-it basis under such conditions that the other party cannot obtain the desired product or service except by acquiescing in the standardized contract. (*Ibid.*; *Steven v. Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 882.) Dexcom's admissions in its return to the order to show cause that the Terms of Use, including the arbitration provision, are not negotiable and that it has a unilateral right to change them "suffic[e] to establish some degree of procedural unconscionability." (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 915; see *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1534 [presentation of contract with standard provisions on " 'take it or leave it basis' " established procedural unconscionability].)

Other aspects of procedural unconscionability are absent. Plaintiffs presented to the trial court no evidence they had no way to monitor their blood glucose levels other than by using the G6 App and accepting the associated Terms of Use, and at oral argument in this court their counsel conceded other glucose monitoring devices are available in the marketplace. "The availability of alternative sources from which to obtain the desired service defeats any claim of oppression, because the consumer has a meaningful choice." (*Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1245; see *George v. eBay, Inc.* (2021) 71 Cal.App.5th 620, 632 [discussing cases that rejected unconscionability claims when claimant did not lack market alternatives].) The arbitration provision is also lacking in surprise. Arbitration has for decades been such a common means of dispute resolution that inclusion of an arbitration provision in a consumer

15

contract cannot fairly be said to defeat the reasonable expectations of consumers. (See, e.g., *Smith v. GC Services Ltd. Partnership* (7th Cir. 2018) 907 F.3d 495, 500 [arbitration provisions in credit card agreements are "commonplace"]; *Spain v. Johnson* (D.Colo. 2024) ___ F.Supp.3d ___, ___ [2024 WL 907435, p. *3] ["the use of arbitration is common and not unreasonable"]; *Patterson v. ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659, 1665 ["arbitration per se may be within the reasonable expectation of most consumers"].) The existence of the arbitration provision in Dexcom's Terms of Use was called to plaintiffs' attention in all capital letters on the first or second page of the printed version, and the provision itself was set out several pages later as a separate section in plain language and in all capital letters. (See maj. opn., *ante*, pp. 8–9 & fns. 2 & 3.) The degree of procedural unconscionability is therefore minimal.

Plaintiffs' emphasis on their status as "patients" does not increase the degree of procedural unconscionability. Plaintiffs received no diagnostic or therapeutic services from Dexcom and so were not its patients. They used a software application (the G6 App) that Dexcom made available to them so that they could track their blood glucose levels in real time on personal mobile devices. Plaintiffs' consenting to the Terms of Use as part of the initial launch of the G6 App, presumably at their convenience and from the comfort of their home or office, is unlike a patient's signing a form to gain admission to a hospital for a necessary medical procedure. Nothing in the record suggests in launching the G6 App any plaintiff suffered "the stress, anxiety, and urgency which ordinarily beset a patient seeking hospital admission." (*Wheeler*, *supra*, 63 Cal.App.3d at p. 366.) And although a patient admitted to a hospital in 1971 reasonably might not have expected the admission form to contain a provision for arbitration of medical

16

malpractice claims (*id.* at pp. 349, 360–361), that is no longer true. Since that time and with legislative encouragement, arbitration has become a common method of resolving medical malpractice claims. (See Code Civ. Proc., § 1295, enacted by Stats. 1975, ch. 1, § 26.6 [medical services contract provisions for arbitration of professional negligence disputes are enforceable if they comply with notice requirements]; *Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 578 ["The purpose of section 1295 is to encourage and facilitate arbitration of medical malpractice disputes."]; *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 714 ["arbitration has become a proper and usual means of resolving civil disputes, including disputes relating to medical malpractice"].) *Wheeler* thus does not support plaintiffs' contention that, because they are "patients," the arbitration provision in Dexcom's Terms of Use exceeds their reasonable expectations.

C

Having shown only a minimal degree of procedural unconscionability, plaintiffs must show a high degree of substantive unconscionability to prevail on their unconscionability defense. (*Swain v. LaserAway Medical Group, Inc.* (2020) 57 Cal.App.5th 59, 75; *Parada v. Superior Court* (2009) 176 Cal.App.4th 1554, 1584–1585.) In an attempt to do so, they argue the arbitration provision is substantively unconscionable because Dexcom's Terms of Use disclaim all warranties and preclude liability for punitive damages. That attempt fails.

The provisions of the Terms of Use to which plaintiffs object are located outside the arbitration provision. Plaintiffs do not explain how those provisions make the arbitration provision itself substantively unconscionable. An arbitration provision is severable from the rest of the contract if the contract affects interstate commerce and is thus subject to the Federal

17

Arbitration Act (FAA; 9 U.S.C. § 1 et seq.). (*Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440, 445; *Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, 273–274.) The FAA covers contracts, such as Dexcom's Terms of Use, that are formed over the Internet and govern services provided over the Internet. (*U.S. v. Sutcliffe* (9th Cir. 2007) 505 F.3d 944, 953 [Internet is instrumentality and channel of interstate commerce]; *S.S. by and through Stern v. Peloton Interactive* (S.D.Cal. 2021) 566 F.Supp.3d 1019, 1042 [FAA applies to terms of service for use of app and website that require Internet use].) Where, as here, the arbitration provision is severable, a challenge to other provisions of the contract, "without a focused challenge to the arbitration provision, does not preclude arbitration. [Citation.] The basis of the challenge must be 'directed specifically to the agreement to arbitrate before the court will intervene.' " (*Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758, 774.) Plaintiffs' challenge to the warranty disclaimers and damages limitations is for the arbitrator to decide. (*Buckeye*, at p. 449; *Phillips*, at p. 774.) They have not established the substantive unconscionability element essential to their defense. (See *OTO*, *supra*, 8 Cal.5th at p. 125 ["Both procedural and substantive unconscionability must be shown for the defense to be established"].)

IV

In sum, I conclude that in granting the motions to compel arbitration the trial court ruled correctly on the issues presented to it. I believe we should confine the scope of our review to those issues. The majority, however, grants writ relief based on a contract formation issue no party ever raised. I dissent from the majority's decision to reach that issue and from its decision on the merits of the issue. I would deny the petitions.

18

IRION, Acting P. J.